IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| McGOWEN PRECISION BARRELS, LLC, | CV 22-39-M-KLD |
| Plaintiff, | |
| vs. | ORDER |
| PROOF RESEARCH, INC., | |
| Defendant. | |

This matter comes before the Court on Defendant Proof Research, Inc.'s ("Proof") motion for summary judgment on Plaintiff McGowen Precision Barrels, LLC's ("McGowen") malicious prosecution claim. For the reasons discussed below, Defendant's motion is granted.

## I. **Background**[1]

Proof began making helically wound and ground carbon fiber rifle barrels through its predecessor in interest, Advanced Barrel Systems ("ABS") in 2003. (Doc. 65, ¶ 1; Doc. 64-1, at 1–2). Proof makes rifle barrels pursuant to a patented process that replaces some of the steel with carbon fiber in a way that does not overly compromise the barrel's stiffness or heat-handling abilities, while

---

[1] The Court finds the following facts as provided by the parties' statements of undisputed (Doc. 42) and disputed (Doc. 65) facts and other supporting evidence.

substantially reducing the weight and decreasing the amplitude of vibrations during firing. (Doc. 65, ¶¶ 1–3). In non-technical terms, the patented process begins with a hollow steel rod with the center bored out to the desired size for the bullet to travel through. (Doc. 41, at 11; Doc. 65, ¶ 8). Next, outer portions of the steel rod are machined away to make what is called a "barrel liner." (Doc. 41, at 11; Doc. 65, ¶ 8). After coating black carbon fiber tows with a clear resin and winding them around the machined-out portion of the barrel liner, the barrel is cured at a high temperature. (Doc. 65, ¶ 8). Proof maintains that after curing, the barrel is rough and slightly over-sized, but otherwise functional, though not marketable. (*See* Doc. 65, ¶ 8; Doc. 42-1, at 172 [24:11–21]).

Significant to this dispute, ABS, and later Proof, "finish" their barrels by placing them in a lathe and grinding down the rough surface to a smooth finish diameter using progressively finer grinding wheels. (Doc. 65, ¶ 8). This process exposes the outer layers of carbon fiber in "a mottled pattern of irregularly-sized, rippled patches." (Doc. 65, ¶ 8). The barrels are then wiped with a solvent but not coated with any finish. (Doc. 65, ¶ 8). Proof's founder, K.K. Jense, testified that ABS barrels had "a unique pattern and a look [he] liked," contributing to his decision to begin purchasing barrels from ABS in 2008, and later purchase the company and its patent in 2011. (Doc. 65, ¶¶ 2–3).

Ronald Duplessis is the sole owner of McGowen, a steel firearm barrel and barrel liner manufacturer formed in 2006, and its sister company, Carbon Six Barrels, LLC ("Carbon Six").[2] (Doc. 65, ¶¶ 11, 14; Doc. 42-1, at 217–18, 221–23). Carbon Six purchases barrel liners exclusively from McGowen and wraps them with a continuous-filament carbon fiber and epoxy resin composite. (Doc. 42-1, at 417). Although Proof and Carbon Six differ in the technical way in which they structurally engineer the carbon fiber composite materials around the barrel liners, their finished barrels look "quite similar." (Doc. 42-1, at 433).

In May 2012, Proof applied to register its trade dress ("Mark") with the United States Patent and Trademark Office ("USPTO"). (Doc. 42-1, at 62–71). The USPTO initially refused to register the Mark, noting it "consisted of nondistinctive features of a product design that is not registrable on the Principal Register without sufficient proof of acquired distinctiveness" and "the applied for mark includes elements that are functional." (Doc. 42-1, at 80–81). In an email discussing this initial refusal, Proof's then-attorney, Bradley Smith, advised its then-CEO, Pat Rainey, that if the finish of the barrel was a natural consequence of the manufacturing process, Proof could not get a trademark. (Doc. 42-1, at 110). Three

---

[2] Duplessis incorporated Carbon Six in 2019, however, Hunters Run Gun Club, LLC, which he formed in 2004, began doing business as Carbon Six in 2016. In 2017, Carbon Six began selling its carbon fiber wound barrels for bolt action rifles to sportsman and the general public. (*See* Doc. 65, ¶ 14; 64-4, ¶¶ 5–7).

3

days later, Proof responded to the USPTO by asserting that "nothing in the patent or the underlying technology dictates the appearance of the Mark on gun barrels incorporating the patented technology, namely, the unique irregular, mottled, rippled patches on the finished barrel." (Doc. 42-1, at 126).

Along with an attached declaration from Rainey, Proof's response included a list of "other simpler, cheaper, and commercially viable finishing techniques" that Proof claimed could be used to finish the barrels and not display the Mark, as well as photographs of carbon fiber rifles displaying a regular, geometric pattern distinct from the Mark, and Proof's marketing and advertising initiatives to evidence the extent to which the Mark had become distinctive over its ten years of Proof's "extensive and continuous use." (*See* Doc. 42-1, at 124–25, 127–28). The response argued that "[w]hen considering the above evidence in total, it becomes apparent that the Mark, as a whole, is distinctive and has acquired secondary meaning identifying only the Applicant as the source of the identified services in the minds of the consuming public." (Doc. 42-1, at 125). On August 27, 2013, the USPTO registered the Mark. (Doc. 42-1, at 157). On June 3, 2014, Proof also registered the name "PROOF," consisting of "standard characters without claim to any particular font, style, size, or color." (Doc. 42-1, at 161).

In November 2013, Proof acquired Performance Polymer Solutions, a company cofounded by Drs. David Curliss and Jason Lincoln, who began working

on a new patent application on Proof's behalf for "a composite projectile barrel . . . comprising a continuous fiber composite outer shell whose average effective coefficient of thermal expansion in the longitudinal direction approximately matches that of an inner liner . . . exhibits light weight, superior axial stiffness and strength, durability, and is reliably accurate." (Doc. 65, ¶ 10). Proof was awarded U.S. Patent No. 10,168,117 ("the '117 Patent") in January 2019. (Doc. 65, ¶ 10).

On June 2, 2016, Proof sent a cease-and-desist letter to Carbon Six, informing the company of its Mark and demanding it "cease and desist from selling, distributing, advertising, or promoting barrels, or rifles fitted with barrels, having a ground carbon fiber composite winding finish" with Proof's "distinctive trade dress." (Doc. 42-1, at 455–58).[3] On June 10, 2016, Carbon Six responded with a letter, stating, "We strongly believe that once the facts are brought to light, [the Mark] will be cancelled," and "we do not believe that any action on our part is necessary." (Doc. 42-1, at 460–64).

In March 2017, Carbon Six launched its website, carbonsixllc.com. (Doc. 65, ¶ 18; Doc. 64-4, ¶ 9). Proof discovered that Carbon Six was using the word "proof" in the copy of its online advertising materials and planting the word "proof" throughout its website metadata in an apparent attempt to direct online

---

[3] Proof also sent cease-and-desist letters to two other McGowen customers, Primary Weapons Systems and Fierce Firearms. (Docs. 64-1, at 7; 15-4, 15-5).

searches for Proof's carbon fiber barrels to Carbon Six's website. (Doc. 65, ¶¶ 14, 18). Duplessis testified that as soon as he was notified about these "meta tags," he had them removed. (Doc. 65, ¶ 18).

On December 15, 2017, Proof filed a complaint against McGowen in this district court, alleging trademark infringement, unfair competition, and trademark dilution under the Lanham Act. (Doc. 65, ¶¶ 14–15; Doc. 64-3; *Proof Research, Inc. v. McGowen Precision Barrels, LLC*, No. 9:17-cv-00173-DLC (D. Mont. 2017) ("Infringement Proceeding")). On December 22, 2017, McGowen filed a Petition for Cancellation of the Mark ("Cancellation Proceeding") with the USPTO Trademark Trial and Appeal Board ("TTAB"), asserting five grounds for cancellation: the Mark comprised matter that is functional; the Mark represented multiple marks; the trade dress was generic; the trade dress was aesthetically functional; and Proof committed fraud in the procurement of its registration. (Doc. 65, ¶ 15; Doc. 42-1, at 487–97). On January 16, 2018, the parties agreed to stay the Infringement Proceeding pending the outcome of the Cancellation Proceeding. (Doc. 65, ¶ 15).

The parties proceeded to litigate the Mark's validity in front of the TTAB, conducting extensive discovery, including written discovery, disclosure of expert opinions, and depositions. (Doc. 65, ¶ 16). Throughout the Cancellation Proceeding, Proof maintained its Mark was not necessary to the functionality of its

barrels. (Doc. 65, ¶ 17). However, during a deposition on August 21, 2018, Curliss, who was at that time the general manager of Proof's Advanced Composites Division, admitted that, although the '117 Patent did not disclose any particular finish, if one were to follow the instructions in the patent application, "[w]ith no further coatings applied to the external surface of a ground barrel, it will exhibit the trade dress." (Doc. 65, ¶ 10; Doc. 42-1, at 168, 173).

On August 30, 2018, Proof applied to renew the Mark's registration. (Doc. 42-1, at 620). On September 13, 2018, the USPTO issued a notice stating Proof's trademark registration of the Mark would remain in force. (Doc. 42-1, at 620).

In November 2018, McGowen moved the TTAB for summary judgment, arguing, in part, that the Mark should be cancelled due to functionality. (Doc. 65, ¶ 20). The TTAB denied McGowen's motion as to the issue of functionality, concluding that:

> With respect to the claim that the involved mark is "wholly functional," at a minimum, there is a genuine dispute of material fact as to whether the exclusive use of rifle barrels formed with a mottled pattern of irregularly-sized, rippled patches created by the carbon fiber filament winding process would put competitors at a significant non-reputation-related disadvantage and whether finishing a carbon fiber rifle barrel by using any method other than that which results in the registered mark significantly affects cost or quality. The fact-intensive nature of whether the trade dress as a whole is functional makes it particularly unsuited to summary judgment.

(Doc. 65, ¶ 21 (internal citations and quotation marks omitted)).

In January 2021, the parties submitted trial briefs for a decision on the merits, incorporating extensive evidence, exhibits, and over 3,300 pages of testimony. (Doc. 65, ¶ 22). On May 20, 2021, the TTAB canceled Proof's registration on the grounds of functionality, finding "the trade dress comprising the mark in the Registration is, as a whole, functional under Section 2(e)(5) of the [Lanham] Trademark Act, 15 U.S.C. § 1052(e)(5)," and declined to rule on McGowen's remaining claims. (Doc. 65, ¶¶ 25–26).

On August 3, 2021, Proof filed a Notice of Voluntary Dismissal of the Infringement Proceeding under Fed. R. Civ. P. 41(a)(1)(A)(i). (Doc. 65, ¶ 26, Infringement Proceeding, Doc. 26). On August 4, 2021, McGowen filed a motion to deny the dismissal, asking the District Court to allow it 21 days to file an answer and counterclaim. (Doc. 65, ¶ 26; Infringement Proceeding, Doc. 30). The District Court denied McGowen's motion, finding the stay imposed during the pendency of the TTAB proceeding did not extinguish Proof's absolute right to voluntarily dismiss the action prior to service by the defendant of an answer or a motion for summary judgment under Rule 41. (Infringement Proceeding, Doc. 32).

McGowen filed this action on February 10, 2022, alleging Count I: False or Fraudulent Registration of a Trademark under the Lanham Act § 38, 15 U.S.C. § 1120; Count II: Malicious Prosecution; and Count III: Tortious Interference with Business Relations/Prospective Economic Advantage. (Doc. 1). Proof moved to

dismiss McGowen's claims under Rule 12(b)(6), and this Court entered an order on October 28, 2022, dismissing all but McGowen's malicious prosecution claim. (Doc. 29). Proof now moves for summary judgment as to McGowen's sole remaining claim of malicious prosecution. (Doc. 40).

## II.   <u>Legal Standard</u>

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).

Once the moving party has satisfied its initial burden with a properly supported motion, to defeat summary judgment, the non-moving party must designate by affidavits, depositions, answers to interrogatories or admissions on file "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. 317, 324 (1986). The party opposing a motion for summary judgment "may

not rest upon the mere allegations or denials" of the pleadings. *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249–50. The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020–21 (9th Cir. 2007).

## III.  **Discussion**

"A malicious prosecution begins in malice, without probable cause to believe the action can succeed, and finally ends in failure." *Plouffe*, 45 P.3d at 14. A central issue in evaluating every malicious prosecution claim is "whether the individual responsible for advancing or pursuing the underlying court action lacked probable cause for doing so." *Edwards v. Curtis*, No. CV 14-239-M-JCL, 2016 WL 183647, at *3 (D. Mont. Jan. 14, 2016) (citing *Spoja v. White*, 317 P.3d 153, 156 (Mont. 2014)). *See also Plouffe v. Mont. DPHHS*, 45 P.3d 10, 15 (Mont. 2002) ("Lack of probable cause is the gist of a malicious prosecution action.").

Probable cause to initiate a civil action requires the party initiating the legal action to have a "reasonable belief in the existence of facts upon which the claim is based, and reasonably believes that those facts give rise to a valid claim." *Spoja*, 317 P.3d at 156 (citing *Hughes v. Lynch*, 164 P.3d 913, 918 (Mont. 2007);

*Plouffe*, 45 P.3d at 15). Probable cause is based on a totality of the circumstances and under an objective standard from the perspective of the initiating party at the time the lawsuit was filed. *McAtee v. Morrison & Frampton, PLLP*, 512 P.3d 235, 240 (Mont. 2021) (citing *Plouffe*, 45 P.3d at 15); *Spoja*, 317 P.3d at 156. Thus, if the undisputed evidence establishes that Proof reasonably believed facts existed to support its claim when it filed the Infringement Proceeding, then Proof had probable cause to do so and McGowen's allegations of malicious prosecution must fail.

In the context of an action for malicious prosecution, the issues raised by the underlying litigation are relevant to the question of probable cause. Here, Proof sued McGowen under the Lanham Act, 15 U.S.C. §§ 1114(a) and 1125(a), alleging that McGowen, doing business as Carbon Six, was advertising and selling carbon fiber composite firearm barrels "that infringe and dilute Proof's registered trademarks, including adopting its trade dress and gratuitous embedding of Proof's word mark PROOF on its website." (Doc. 64-3, ¶ 1). To prevail, Proof would have needed to prove that: (1) it had a valid, protectable mark, and (2) Carbon Six's use of the mark was likely to cause customer confusion. *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 997 F.3d 1008, 1022 (9th Cir. 2018).

"Trade dress" may be protected under federal law when the "design or packaging of a product acquires a distinctiveness [that] serves to identify the

product with its manufacturer or source," and other uses are "likely to cause confusion as to the origin, sponsorship, or approval or the goods." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 28 (2001). But trade dress protection extends only to product features that are nonfunctional. *Disc Golf Ass'n, Inc. v. Champion Discs, Inc*., 158 F.3d 1002, 1006 (9th Cir. 1998). *See* 15 U.S.C. § 1115(b)(8) (providing that an affirmative defense to a trademark infringement claim is "[t]hat the mark is functional"). This makes sense because "[t]he Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." *TrafFix*, 532 U.S. at 34. Accordingly, "one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional." *TrafFix*, 532 U.S. at 29–30.

"A product feature is functional 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.'" *Disc Golf*, 158 F.3d at 1006. Functionality is assessed under the fact-intensive *Morton-Norwich* factors: (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts

indicating that the design results in a comparatively simple or cheap method of manufacturing the product. *In re Becton, Dickinson & Co.*, 675 F.3d 1372, 1374 (Fed. Cir. 2012). No one factor is dispositive, and all should be weighed collectively. *Disc Golf*, 158 F.3d at 1006. When challenged, registered marks are entitled to the rebuttable presumption that they are distinctive and nonfunctional. 15 U.S.C. § 1115(a).

As an initial matter, in opposing summary judgment, McGowen argues that because Proof possessed all the information needed to determine its Mark was invalid due to functionality at the time it filed the Infringement Proceeding, Proof's continued denial of functionality is not reasonable. (Doc. 64, at 15). McGowen relies on three pieces of evidence to argue Proof did not have probable cause to file the Infringement Proceeding because it knew its Mark was functional. Because the parties dispute the admissibility of one of the asserted documents, the Court will begin by addressing why the unredacted draft document (Doc. 64-5), which was attached to an email that Proof inadvertently produced, is not properly considered on summary judgment.

In its response brief, McGowen relies on a document called "CarbonSix Petition to Cancel – BLS comments.pdf," which was attached to a redacted April 19, 2017 email from Bradley Smith to Dr. Curliss and Larry Murphy, Proof's then CEO and general manager. The document contains Smith's comments and draft

13

responses to allegations in McGowen's draft petition to cancel the Mark, which its counsel sent to Smith on April 14, 2017. Among the draft responses is Smith's proposed admission to the following fact: "Registrant claims the mottled appearance resulting from the manufacture of its carbon fiber composite barrel as trade dress." (*See* Doc. 64-5 (unredacted) and Doc. 72-1, at 5–14 (redacted)). McGowen argues this admission proves Proof knew its trade dress was functional as of April 19, 2017.

Proof asserts this document is privileged attorney-client and work product that was inadvertently produced during discovery. Proof maintains it first learned the document had been inadvertently produced after reviewing McGowen's response brief on June 13, 2023. That same day, Proof sent McGowen a Rule 26(b)(5)(B) clawback notice, noting the self-evident nature of the privileged material and requesting McGowen follow the Rule 26 procedure and "promptly return, sequester, or destroy" the document. (Doc. 72-1, at 18). McGowen replied that it disagreed the inadvertent disclosure was self-evident and declined to remove the privileged material from its briefing, but assured Proof that the document had been sequestered and would not be disseminated until the Court resolved the dispute. (Doc. 72-1, at 19). Currently filed under seal, Proof requests the Court strike the inadmissible portions of McGowen's response brief and statement of

disputed facts and order a return of the privileged material. The Court will address the parties respective arguments in turn.

Montana law governs the issue of attorney-client privilege in this case, but the work-product doctrine is governed by federal law. *Moe v. System Transport, Inc.*, 270 F.R.D. 613, 622 (D. Mont. 2010) (citing Fed. R. Evid. 501).

The attorney-client privilege has deep roots in the American legal system. *Nelson v. City of Billings*, 412 P.3d 1058, 1068 (Mont. 2018) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). The privilege "protects confidential communications between an attorney and client during the course of the professional relationship," ensuring attorneys are free to "give accurate and candid advice to their clients without the fear that it will later be used against the client." *Nelson*, 412 P.3d at 1068. The Montana Supreme Court has adopted eight essential elements to establish attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*In re Grand Jury Invests.*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992). *See State ex rel. U.S. Fidelity & Guar. Co. v. Montana 2d Jud. Dist. Ct.,* 783 P.2d 911, 914–15 (Mont. 1989) (adopting the Ninth Circuit standard).

The attorney work-product doctrine protects materials "prepared in anticipation of litigation or for trial or for another party or its representative." Fed. R. Civ. P. Rule 26(b)(3). Similar to attorney-client privilege, the work-product doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238 (1975). To qualify for work-product protection, "documents must have two characteristics: (1) they must be prepared in anticipation of litigation or for trial, and (2) they must be prepared by or for another party or by or for that other party's representative." *Volker v. BNSF Ry. Co.*, No. CV 18-172-M-DLC, 2020 WL 6742865 at *2 (D. Mont. Nov. 17, 2020) (citing *In re Grand Jury Subpoena*, 357 F.3d 900, 907 (9th Cir. 2004)).

Although these privileges are foundational, neither is absolute. *Nobles*, 422 U.S. at 238. "Ordinary work product," which includes documents and tangible things prepared in anticipation of litigation, "is discoverable if the requesting party shows a 'substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.'" *Moe*, 270 F.R.D. at 626–27 (quoting Fed. R. Civ. P. 26(b)(3)(A)(ii)). But even if work product material is discoverable, the Court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B). Thus,

16

"opinion work product" is only discoverable "when mental impressions are directly at issue in a case and the need for the material is compelling." *Dion v. Nationwide Mut. Ins. Co.*, 185 F.R.D. 288, 292 (D. Mont. 1998).

McGowen makes three arguments as to why the disputed document should be admitted. First, McGowen contends Proof waived attorney-client privilege by asserting it "had probable cause based on Smith's legal advice." Second, McGowen claims it has a "substantial need" for the disputed work product because it is the best evidence, which McGowen cannot obtain by any other means, that Proof was informed in 2017 that its Mark was functional. Third, McGowen argues Proof waived both attorney-client privilege and work product protection by failing to take reasonable steps to timely rectify the inadvertent disclosure. None of these arguments have merit.

The Court finds this draft document is protected both by the attorney-client privilege and as opinion work product. First, McGowen does not contest that the disputed document was initially protected by attorney-client privilege as it is undisputedly communication between Proof and its attorney, made in confidence, regarding legal advice in Smith's capacity as Proof's legal advisor. Regarding the alleged waiver, despite McGowen's attempts to obfuscate the issue, this document is well beyond the scope of Proof's waiver of attorney-client privilege "as it

pertains to obtaining Registration No. 4,390,533, which was issued to Proof on August 27, 2013." (Doc. 56, at 1).

Proof has repeatedly made clear to McGowen and the Court that its waiver is "limited to the subject matter of obtaining the [registration of the Mark], not the analysis of individuals infringing on the [Mark], patent matters, litigation concerning the [Mark], or other legal matters." (Doc. 72-1, at 16–17). Proof affirmed the scope of this waiver in its response to McGowen's Rule 56(d) motion (Doc. 51, at 10), and again in the parties' joint motion for a second discovery status conference on April 21, 2023, (Doc. 53, at 12–15). Following the discovery conference, Proof explicitly stated in its Notice of Withdrawal:

> [Proof] hereby withdraws its advice of counsel defense as it pertains to filing the infringement action, *Proof Research, Inc. v. McGowen Precision Barrels, LLC*, No. 9:17-cv-173-DLC (D. Mont.). Proof continues to assert the advice of counsel defense only as it pertains to obtaining Registration No. 4,390,533 [(the Mark)], which was issued to Proof on August 27, 2013.

(Doc. 56, at 1). Thus, McGowen's argument that Proof waived attorney-client privilege by contending it had probable cause for the Infringement Proceeding based on Smith's legal advice fails.

Next, McGowen's attempt to classify this document as "ordinary, non-opinion work product," is disingenuous. (*See* Doc. 72, at 8). Smith's "comments" to McGowen's draft petition to cancel the Mark plainly qualify as Proof's attorney's "mental impressions, conclusions, opinions, or legal theories" regarding

the allegations in the petition. The Federal Rules of Civil Procedure explicitly bar production of this type of work product except when there is a "compelling" need *and* the attorney's mental impressions are "directly at issue in [the] case." *Dion*, 185 F.R.D. at 292. Here, the Court need not determine whether McGowen has presented a compelling need because Smith's mental impressions are not directly at issue in this case. Because Proof is only asserting an advice of counsel defense regarding the Mark's registration—and not its decision to file the Infringement Proceeding—Smith's mental impressions, conclusions, opinions, or legal theories concerning the allegations in McGowen's draft petition to cancel the Mark in 2017 are not directly at issue and work product protection is not waived.

Finally, as to McGowen's final argument, there is no genuine dispute that the document was inadvertently produced. Under Federal Rules of Evidence Rule 502(b), an inadvertent disclosure does not waive attorney-client privilege or work product protections if the holder of the privilege or protected document took reasonable steps to prevent its disclosure and reasonable steps to rectify the error, "including (if applicable) following Rule 26(b)(5)(B)." Rule 26 is applicable here and provides the following clawback procedure for handling inadvertently produced discovery:

> If information produced in discovery is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information

> of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The producing party must preserve the information until the claim is resolved.

Fed. R. Civ. P. 26(b)(5)(B). *See also United States Fire Ins. Co. v. Icicle Seafoods, Inc.*, No. C20-401 RSM, 2021 U.S. Dist. LEXIS 153085, at *3–4 (W.D. Wash. Aug. 13, 2021) (listing the elements for establishing that a party has complied with Rule 26(b)(5)(B) and is entitled to the return of its documents, mirroring the Rule 502(b) waiver analysis).

Here, Proof produced the disputed document in February 2023, in a batch of discovery that contained over 5,400 pages of documents and communications with numerous redacted privileged attorney-client and work-product materials, including the email to which the disputed document was attached. (*See* Doc. 72, at 13). On March 17, 2023, Proof supplemented its discovery responses and produced another round of documents, which included a subsequent email in the same chain with Smith's notes. In that version, Proof had both redacted the email *and* redacted Smith's attached comments. (Doc. 72, at 13; Doc. 72-1). Based on the breadth of discovery, the redacted and marked as privileged email chain to which the unredacted disputed document was attached, and the existence of the

second completely redacted version of the same document, the Court finds that

Proof took reasonable steps to prevent the document's disclosure.

Next, Proof claims it first learned of the inadvertent disclosure when it

reviewed McGowen's summary judgment response brief on June 13, 2023.

McGowen argues it put Proof on notice that the document had been inadvertently

produced months earlier when it referenced the duplicate production in a draft

motion to compel that was attached as an exhibit to a proposed joint discovery

motion, which Proof refused to join. (*See* Doc. 72, at 2; Doc. 53, at 15). Proof

maintains it did not see the buried reference and McGowen presents no evidence to

the contrary. Therefore, McGowen's claimed "notice," made in an exhibit to an

exhibit in a draft motion to compel that was never agreed to or submitted by the

parties, was clearly insufficient to alert Proof to its mistake. Once the inadvertent

disclosure was actually discovered on June 13, 2023, Proof timely notified

McGowen.[4]

Because the Court finds that Proof took reasonable steps to prevent the

document's disclosure and to timely rectify the error, Proof's inadvertent

---

[4] Although McGowen argues Proof waited an additional month after demanding the document be clawed back to request an informal discovery conference with the Court, it was not Proof's, but McGowen's burden to "present the information to the court under seal for a determination of the claim." Fed. R. Civ. P. 26(b)(5)(B); *Coleman v. Sterling*, No. 09-CV-1594-W (BGS), 2011 U.S. Dist. LEXIS 174514, at *9 (S.D. Cal. Nov. 3, 2011). Thus, any delay in bringing the issue before the Court does nothing to support McGowen's timeliness argument.

disclosure did not waive its attorney-client privilege or work product protections and the document is not properly before the Court. Accordingly, the Court will neither consider the document nor McGowen's argument to the extent that it relies on the document.

Returning to Proof's motion for summary judgment, Proof maintains that it reasonably believed Carbon Six was infringing on its Mark when it filed the Infringement Proceeding. Starting with the premise that its Mark was entitled to a presumption of validity at the time it filed the Infringement Proceeding, Proof points to the lengthy and highly technical Cancellation Proceeding itself as evidence that the parties had a legitimate and technically-complicated dispute about the Mark's functionality, establishing its probable cause to initiate the Infringement Proceeding and precluding McGowen's "follow-on" malicious prosecution action.

McGowen disputes that Proof is entitled to a presumption of its mark's validity in this case because "[i]f Proof was ever entitled to a 'strong presumption' of validity, it was only because it registered an invalid trademark." (Doc. 64, at 31). McGowen's statement misses the point.

It is undisputed that Proof's Mark was registered on the Principal Register in the Patent and Trademark Office when it filed the Infringement Proceeding. (Doc. 42-1, at 157). Under the plain language of the Lanham Act, Proof is therefore

entitled to a presumption that its Mark was valid. 15 U.S.C. § 1115(a) ("a mark registered . . . and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark . . . and of the registrant's exclusive right to use the registered mark in commerce"); *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir. 1994) (explaining that registered marks are entitled to the rebuttable presumption that they are distinctive and nonfunctional).

Although the presumption of validity in 15 U.S.C. § 1115(a) may be overcome by a party seeking to invalidate a registered mark, for the purposes of finding probable cause to initiate an infringement action in a malicious prosecution case, that mark's registration is "prima facie evidence of the validity of the registered mark." *Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 970 (9th Cir. 2007) ("Registration . . . discharges the plaintiff's original common law burden of proving validity in an infringement action." (Citations and internal quotation marks omitted)). Under Montana law, probable cause in the context of a malicious prosecution claim is determined based on the facts known to the initiating party at the time the lawsuit was filed. *Spoja*, 317 P.3d at 156. In seeking the Mark's initial registration, Proof had convinced the USPTO that its Mark was not functional. Upon registration, its Mark was presumptively valid until proven otherwise.

Proof presents additional evidence to support its probable cause argument. First, by filing the Cancellation Proceeding rather than litigate the Infringement Proceeding in federal court, McGowen asked the TTAB to render a decision on the merits of its position, namely that McGowen could not be infringing on Proof's trade dress because the Mark was never valid in the first place. As it did throughout the trademark application process and the TTAB proceedings, Proof maintains that the '117 Patent, like the earlier ABS patent, does not specify any particular finish to the barrel and that its process of grinding down the barrels to the finished look is not necessary to the functionality of the barrels. (*See* Doc. 65, ¶ 17, citing trial testimony and expert reports supporting its position). The USPTO examiner found Proof's argument and evidence compelling enough to award the Mark in 2013. But years later, the TTAB ultimately disagreed with Proof, finding its arguments "wholly artificial," (Doc. 42-1, at 449), and "a red herring" to the merits of the functionality debate because "Proof applies no finish" to its barrels and its "trade dress is the result of a manufacturing process that follows Claim 22 in the '117 Patent." (Doc. 42-1, at 452).

McGowen urges this Court to consider the TTAB's strongly-worded language as evidence that Proof lacked probable cause to initiate the Infringement Proceeding. But there is ample authority that makes clear the TTAB's merits decision does not control this Court's probable cause inquiry; the narrow question

of probable cause does not depend on whether the initiating party's claims ultimately have merit. *Hughes*, 164 P.3d at 919.

As Proof maintains, the Cancellation Proceeding was vigorously litigated and the issue of the Mark's functionality was at the heart of that debate. Contrary to McGowen's argument that Proof knew all along its Mark was invalid because the Mark's validity was initially contested by the USPTO examiner, the Court finds the fact that Proof successfully convinced the initially skeptical USPTO examiner that its trade dress should be protected is undisputed evidence that Proof's decision to file the Infringement Proceeding was *not* entirely unreasonable, even though the same arguments were ultimately rejected by the TTAB.

Further demonstrating the depth and complexity of the functionality dispute, Proof points out that the TTAB denied McGowen's motion for summary judgment in the Cancellation Proceeding, concluding the "fact-intensive nature of whether the trade dress as a whole is functional makes it particularly unsuited to summary judgment." (Doc. 65, ¶ 21). It is undisputed that the TTAB determined the Mark was functional only after careful examination of a "voluminous" evidentiary record, "comprising more than 3,300 pages of testimony, exhibits, and other documentary evidence." (Doc. 42-1, at 408). If, as McGowen claims, the Mark was so obviously functional that Proof should never have applied for it and never

sought to protect it, then the TTAB would have had little trouble deciding the case on summary judgment.

Additionally, when Proof filed the Infringement Proceeding in December 2017, it had recently discovered that Carbon Six was using Proof's name in its website text and metadata to try to direct online searches for Proof's carbon fiber barrels to Carbon Six's website. (Doc. 65, ¶¶ 14–15, 18). Duplessis testified that as soon as he was notified about these "meta tags," he had them removed, (Doc. 65, ¶ 18), but McGowen's argument that this somehow makes the action irrelevant unconvincingly attempts to minimize its impact on this narrow probable cause inquiry. When it filed the Infringement Proceeding in 2017, Proof's concerns that Carbon Six's barrels could cause market confusion that would infringe or dilute its Mark seem far more understandable when there is undisputed evidence showing that Carbon Six indeed sought to capitalize on the apparent similarities between the look of its barrels and Proof's registered trade dress.[5]

---

[5] In its summary judgment response brief, McGowen attempts to deflect Proof's allegations concerning Carbon Six's website content because, as McGowen points out, Carbon Six initially operated as a d/b/a of Hunters Run Gun Club, LLC, and McGowen was in fact a separate company with a separate website and Facebook page from Carbon Six. (See Doc. 64, at 23–24; Doc. 64-4, ¶¶ 5–15). However, the Court finds this argument immaterial to the issue of probable cause as it is clear from Proof's complaint that when it filed the Infringement Proceeding, Proof believed McGowen was doing business as Carbon Six. (Doc. 64-3, ¶ 1). The Court also notes that when asked during the Cancellation Proceeding, "Does CarbonSix, that is McGowen, own and operate the website at carbonsixllc.com?" Duplessis answered in the affirmative. (Doc. 42-1, at 222).

To support its argument against summary judgment, McGowen relies on evidence contained in a 2013 email between Bradley Smith and Pat Rainey and deposition testimony from Dr. Curliss, which McGowen claims proves that Proof knew all along its finish was a natural consequence of winding carbon fiber tows around a sleeve to produce a gun barrel, meaning Proof's arguments that the Mark was not functional were never reasonable.

For context, the email from Smith to Rainey states, "An especially critical question is whether the patented process naturally (or necessarily) leads to the barrel's appearance." (Doc. 42-1, at 110). Smith continues, "[the examiner] is concerned that by granting trade dress protection, it could effectively give you a permanent monopoly over the patented process (as opposed to your 20-year patent term)." (Doc. 42-1, at 110). In Rainey's declaration to the USPTO examiner, he responded to the examiner's concern in the negative, stating, "The irregular, mottled finish of Proof's guns is not a necessary consequence of producing barrels under Proof's patented process. There are many different ways to produce an attractive and fully functional barrel using the patented method that would not result in the distinctive mottled appearance claimed." (Doc. 42-1, at 129). Seeking to show the contradiction in Proof's position, McGowen points to later deposition testimony from Dr. Curliss, who admitted to the TTAB that "with no further

coatings applied to the external surface of a ground barrel, it will exhibit the trade dress." (Doc. 65, ¶ 24).

While McGowen argues these statements are evidence Proof "knew" its Mark was functional, the Court disagrees. Considering the email exchange, the statements in Rainey's declaration, and Dr. Curtiss's testimony in full, none of it concedes *functionality*. Rather, Rainey's response, although eventually found to be "wholly artificial" by the TTAB, nevertheless supports Proof's claim that it viewed its unique trade dress as one of many possible aesthetic finishing options. And as Dr. Curliss also testified, "the objective of the '117 patent is structural. There is nothing in there to do with the surface finish." (Doc. 65, ¶ 24). Although this statement may have been largely disregarded by the TTAB, given the numerous factors that influence the legal analysis for determining functionality as a matter of law, the fact that the TTAB ultimately disagreed with Proof's understanding of the facts, or its application of the facts to the law, does not mean that its interpretation was unreasonable.

At most, the above evidence offered by McGowen shows that when it filed the Infringement Proceeding, Proof understood its trade dress was *potentially* functional, as evidenced by the fact that the issue had required special scrutiny from the USPTO. But in approving Proof's application after Proof submitted additional evidence and argument, the USPTO examiner had agreed with Proof's

position that, on balance, the Mark was not functional. The fact that Proof's application presented a close call for the examiner is not convincing evidence that Proof knew with legal certainty its Mark comprised matter that, as a whole, was functional.

Accordingly, the Court finds that, viewing the evidence in the light most favorable to McGowen and drawing all justifiable inferences in McGowen's favor, the undisputed evidence establishes Proof had a reasonable belief that Carbon Six was diluting or infringing on its Mark when it filed the Infringement Proceeding. Because the Court concludes that Proof had probable cause to file the Infringement Proceeding, McGowen's claim for malicious prosecution fails as a matter of law.[6]

## IV.   **Conclusion**

For the reasons discussed above,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is GRANTED.

**IT IS FURTHER ORDERD** that all references to the disputed document (Doc. 64-5, at 5–10) are stricken from McGowen's summary judgment response

//

//

---

[6] As a finding that Proof had probable cause to file the Infringement Proceeding is dispositive of McGowen's malicious prosecution claim, the Court need not address the remaining elements or the parties' alternative arguments.

brief (Doc. 64) and statement of disputed facts (Doc. 65). Additionally, McGowen

shall return the disputed document to Proof.

DATED this 24th day of August, 2023.

Kathleen L. DeSoto
United States Magistrate Judge